BAINBRIDGE *v.* SHERLOCK and Others.

OHIO RIVER.—The *Ohio* river being a great navigable highway between states, the public have all the rights that by law appertain to navigable streams, as against riparian owners. But the public rights are upon the river, not upon the banks. The title of the riparian owner extends to low water mark.

WHARFS.—The right to use the river as a highway does not imply the right to use the banks for the purposes of landing to receive and discharge freight and passengers.

SAME.—Except in cases of peril or emergency, the navigator has no legal

right to land, without the consent of the riparian owner, at places other than those that have in some way become public landing places.

SAME.—Riparian owners may extend wharfs to and into the navigable portion of the river, provided they do not unnecessarily obstruct navigation.

SAME.—Whoever would maintain a wharf for the accommodation of any particular class of vessels, should possess a sufficient water front to contain that class of vessels, without obstructing access to the lands of contiguous proprietors.

SAME.—A wharf boat, moored to the shore, is entitled to the same immunity from trespass, or obstruction by vessels navigating the river, as is the land itself to which the wharf boat is moored.

SAME.—The navigator landing at one wharf, with permission of the wharfinger, is not justified, by any public right in the river, in so landing and mooring his vessel as that while landed its side and stern will be carried by the current against the wharf boat of a contiguous wharfinger, lower down the river, thereby obstructing access to the lower wharf.

APPEAL from the *Jefferson* Circuit Court.

GREGORY, C. J.—There are errors and cross-errors assigned, but all the questions involved turn upon the nature and extent of the rights of the riparian owners along the *Ohio* river.

The appellant owns real estate in the city of *Madison*, bordering on the river. The river front of this property extends from the west line of *West* street two squares down the river. This river front is graded from the top of the bank to the water line, and is known as wharf property. For many years the appellant has kept upon this property a wharf boat, subservient to the uses of river navigation and commerce. For the use of it he receives, from steamers and other watercraft navigating the river, from $3 to $25 for each landing, depending on the length of time a boat remains at the wharf, and the amount of business done. Two other public wharfs are maintained at *Madison*, viz., the "Roe Wharf," extending from the eastern line of *West* street up the river one hundred and sixty-eight feet to the west line of an alley, and the "City Wharf," extending from the east line of that alley up the river one hundred and sixty-eight feet to *Mulberry* street. *West* street is sixty feet wide; it is the principal thoroughfare leading from the

steamboat landing up into the city. The appellant keeps his wharf boat below *West* street, upon and near the upper end of his wharf property. This location is convenient to the mouth of *West* street. The water is not as good for landing above as at the plaintiff's wharf. The wharf boat at the "Roe Wharf" is kept at the lower end of that wharf property, upon or immediately above the east line of *West* street. By placing the *Roe* wharf boat at that place, it also is near the mouth of *West* street, and is also in better water for the approach of steamers.

The appellees, *The Cincinnati and Louisville Mail Line Co.*, have, for many years, owned and run a daily line of steamers each way, and during a great portion of the time they have run a double daily line of boats each way. For several years past, all these boats have landed at the "Roe Wharf," making, usually, four landings each day. Sometimes a boat thus landed would remain two hours, but ordinarily from a quarter to half an hour. The results of this arrangement, so far as concerned the plaintiff, were that very frequently his wharf boat was struck and broken, and thrown out of water by defendants' steamers, thus causing direct pecuniary damage; and that constantly, at least twice, and usually four times, a day, the large boats of the defendants rested upon plaintiff's wharf, lapping over and covering up from one-third to one-half of his wharf boat. While his wharf boat was thus occupied by defendants' steamers, no other boat could land at it without first pushing them out into the river, occupying from five to ten minutes each time. Another result of this arrangement was, and necessarily would be, that transient steamers approaching the plaintiff's wharf, but finding it thus obstructed, would, whenever there was sufficient water, pass up outside, and land at an unobstructed rival wharf above.

The evidence given, and that offered by the appellant, and ruled out by the court below, tended strongly to show that the plaintiff was damaged by this mode of landing. Is this, in legal sense, an injury, or is it *damnum absque in-*

*juria?* The solution of this question is the turning point of the case.

The inquiry that meets us at the threshold is, what are the rights of the navigator of this river, to the use of its banks and margins? The *Ohio* river is a great navigable highway between states, and the public have all the rights that by law appertain to public rivers as against the riparian owner. But there is no "shore," in the legal sense of that term; that is, a margin between high and low tide—the title to which is common. The banks belong to the riparian owner, and he owns an absolute fee down to low water mark. *Stinson* v. *Butler et al.,* 4 Blackf. 285.

In *Ball* v. *Herbert,* 3 Term 253, the question considered was whether there existed a common law right to use the banks of the river *Ouze* for towing boats. That was a navigable river, and in the state of navigation then existing, the right thus to use the banks was essential. But all the judges concurred in holding that no such right existed at common law.

In *Blundell* v. *Catterall,* 5 Barn. & Ald. 268, (7 Eng. Com. Law 152) determined in the King's Bench, the question was, whether, or not, the public had a common law right of bathing in the sea, and, as incident thereto, of crossing the shore for that purpose. This led to a very general consideration of the subject of public and riparian rights, the result of which was a denial of the right claimed.

Justice HOLROYD, after recognizing the public right of passage over the sea and over navigable rivers, says: "These rights are noticed by Lord HALE; but whatever further rights, if any, they have in the sea or in navigable rivers, it is a very different question whether they have, or how far they have, independently of necessity or usage, public rights upon the shore, (that is to say, between high and low water mark,) when it is not sea or covered with water, and especially when it has from time immemorial been, or has since become, private property. For the pur-

pose of the king's subjects getting upon the sea, and upon the navigable rivers, to exercise their unquestionable rights of commerce, intercourse and fishing, there are not only the ports of the kingdom, established from time to time by the king's prerogative, and called by Lord HALE the *Ostia Regni;* but also public places for embarking and landing themselves and their goods. It was not by common law, nor is it by statute, lawful to come with, or land, or ship customable goods, in creeks or havens, or other places out of the ports, unless in cases of danger or necessity; nor fish or land other goods not customable, where the shore or the land adjoining is private property, unless upon the person's own soil or with the leave of the owner thereof, who, Lord HALE says, may, in such case, take amends for the trespass in unloading upon his ground, though he may not take it as a certain common toll. The public common law rights, too, with respect to the sea, &c., independently of usage, are rights upon the water, not upon the land, of passage and fishing on the sea and on the sea shore, when covered with water; and though, as incident thereto, the public must have the means of getting to and upon the waters for these purposes, yet it will appear that it is by and from such places only as necessity or usage has appropriated to those purposes, and not a general right of lading, unlading, landing, or embarking where they please upon the sea shore, or the land adjoining thereto, except in case of peril or necessity. As to the owner's right to improve the shore, it is laid down that the king cannot grant a right to lade or unlade on the *ripa,* or bank, without the owner's consent. There cannot, therefore, be any common law right to lade or unlade on the quay or shore, or land adjacent in the port. Lord HALE notices and establishes the public right of navigating and fishing upon and in the water, and the right of resort to the ports, and of lading and unlading, landing and embarking therein, either at the public places appointed, or by usage established for those purposes, or, with consent, upon the land either of the king or of individuals, but no further."

Justice BAYLEY, referring to a passage from BRACTON, in his opinion, says: "The word '*ripa*' here applies to rivers and ports, and probably also to the land above the high water mark, and if it does, is this the law of *England?* Have all persons the right to fasten a ship to the banks of a river, or have they a right to tie ropes to the trees, or to land goods on the bank of every navigable river? The case of *Ball* v. *Herbert*, 3 Term Rep. 262, is not a distinct authority upon this point, inasmuch as in that case the right of towing was claimed. But the general question as to the right of the public on the *ripa* of a navigable river was discussed, and the court appear to have been of opinion that the *ripa* of a navigable river was not *publici juris*, and they therefore virtually overruled the authority of BRACTON."

Mr. WASHBURN, in his work on Easements, states the law on this subject thus: "In regard to the right to land upon other points, upon the banks of a navigable stream, than those which have, in some way, become public landings, the law would seem to confine it to cases of necessity, where, in the proper exercise of the right of passage upon the stream of water, it became unavoidable that one should make use of the bank for landing upon, or fastening his craft to, in the prosecution of his passage." Washburn on Eas. and Serv. § 9, p. 403.

The Supreme Court of the *United States*, in *Dutton* v. *Strong*, 1 Black 23, recognized the right of a riparian owner to erect, for private use, a pier extending into a lake, which served the purpose both of a landing place for freight and for its stowage.

The *Ohio* river is a great highway between states under national sanction, yet we suppose that it would not be in conflict with the authority of the general government for this state, within her territorial limits, to provide for and regulate by law public landing places along its shore for the

benefit of trade and commerce, and, for this purpose, to exercise the right of eminent domain.

The right to the use of the river as a highway for passage is distinct from the right to land for the purpose of receiving and discharging freight and passengers. The former is secured to the public; the latter must be exercised with reference to the rights of the riparian owner.

The river being public and its banks being private, it is not difficult to discover the true foundation of those riparian rights, known as wharf rights. It is essential to the successful prosecution of his business that the navigator shall make frequent landings, to lade and unlade, to receive and discharge passengers, and to receive supplies. But, except in case of some peril or emergency of navigation, he cannot thus land without the consent of the riparian owner, and, in return for the privilege of landing, a reasonable compensation may be demanded. This is the origin of wharfage.

In *Blundell* v. *Caterall, supra,* BEST, J., who dissented from the opinion of the court denying the common law right of bathing in the sea, in the course of his opinion says: "The owner of the soil of the shore may also erect such buildings or other things as are necessary for the carrying on of commerce and navigation on any parts of the shore that may be conveniently used for such erections, taking care to impede as little as possible, the public right of way. This is not more inconsistent with a public right of way over it than the right of digging a mine under a road or the erecting of a wharf on a river are inconsistent with the right of way along such road or river. The former does not interfere with the use of the road; and although the latter, in order to be useful, must be carried out beyond the high water mark, and, while the tide is up, must somewhat narrow the passage of the river; yet such wharfs are necessary for the loading and unloading of vessels, and the right of passage must be accommodated to the right of loading and unloading the craft that pass."

Chief Justice ABBOTT, in the course of his opinion in the

same case, says: "By what law can any wharf or quay be made? These, in order to be useful, must be below the high water mark, that vessels or boats may float to them when the tide is in. And it is to be observed that wharfs, quays and embankments, and intakes from the sea, are matters of public as well as of private benefit."

In the case of *Dutton* v. *Strong*, 1 Black 23, above cited, the court say: "Wharfs, quays, piers and landing places for the loading and unloading of vessels, were constructed in the navigable waters of the *Atlantic* states, by riparian proprietors, at a very early period in colonial times; and, in point of fact, the right to build such erections, subject to the limitations before mentioned, has been claimed and exercised by the owner of the adjacent land from the first settlement of the country to the present time."

These wharfs, if they would subserve the only purpose for which they exist, must approach at least to the edge of that portion of the river that is practically navigable. The right to place and maintain them even beyond this point, provided they do not unnecessarily obstruct navigation, is a well established incident to riparian title. The wharf boat is entitled to the same immunity from trespass or obstruction by vessels navigating the river as the land itself.

If a navigator lands, without authority, on a barren bank, he is technically a trespasser for trampling over the pebbles. But incident to the ownership of that barren bank, is a vested right of great possible value—the right to hire it for the incidental use of navigation whenever and wherever a developed river commerce may bring it into demand. The wharf boat represents this right or privilege in its condition of beneficial development. It would be but an idle benefit to the proprietor if the law protected him only against technical trespass upon the naked bank, but refused to protect him in the customary exercise and enjoyment of the only right that makes his title to the bank especially valuable. If the navigator cannot lay his boat *in invitum* against the soil, or obstruct the proprietor's access to the river, still

less should he be allowed thus to use the wharf boat. The very right that in the first case would be but technically violated, would, in the second case, be actually and substantially invaded. It is impossible to conceive of a wharf right without an incidental right of access. In *Irwin* v. *Dixion*, 9 Howard 33, the court say: "From the very nature of wharf property, likewise, the access must be kept open for convenience of the owner and his customers." So, also, it is impossible to conceive of a wharf right without an incidental right to use a reasonable water space in front of it for the purpose of mooring vessels landing at the wharf. Of course that water space, when not actually occupied by boats, may be freely traversed by vessels navigating the river under the general public right; but it cannot be used as against the wharf proprietor, and without his consent, as mooring ground for vessels. One cannot properly be said to own a wharf for any particular class of vessels, unless he has in front of and contiguous to his own soil sufficient mooring ground for that class of vessels. This right to an appropriate space for mooring ground is, in principle, precisely the same thing as the easement known as dock room or dockage, appurtenant to the more elaborate and expensive wharf structures found in commercial seaports, and this right or easement has been repeatedly recognized by judicial determination.

WASHBURN on Ease. & Serv., p. 400, has this passage: "So a party obstructed in the use of a stream as a highway, may himself remove it, as was held where one fastened a raft of logs to the bank in such a manner as to prevent another from landing at his own wharf in a boat."

*Rice* v. *Ruddiman*, 10 Mich. 125, was a case involving the consideration of riparian rights. Judge MANNING, in his opinion in the case, says: "Wharfs and piers are almost as necessary to navigation as vessels and ship yards, or the places for the construction of vessels, are indispensable. * * * It seems to me, on principle as well as reason, that the owner

of the shore has a right to use the adjacent bed of the lake for such purposes."

MARTIN, C. J., in his opinion in that case, says: "They (riparian owners) have the right to construct wharves, buildings, and other improvements in front of their lands, so long as the public servitude is not thereby impaired. They are a part of the realty to which they are attached, and pass with it. Certainly no one can occupy, for his individual purposes, the water in front of such riparian proprietor, and the attempt of any person to do so would be a trespass."

The theory on which the case at bar was tried in the court below, was substantially this: That in the exercise of their rights as navigators, the defendants might land upon and obstruct the plaintiff's wharf as much as they pleased, provided they did it carefully and skillfully, and that, no matter to what extent the plaintiff was actually damaged, he could not be deemed to be legally injured. The court erred in the instructions given and in those refused.

The defendants are presumed to know the natural result of their own acts. They had daily experience to show them that a landing at the "Roe Wharf" would result in injury to the plaintiff. As navigators of the *Ohio* river, they had no right to land on the wharf of the plaintiff, unless by his consent. The defendants were trespassers for each act of injury to the plaintiff caused by landing their boats. The court should have so instructed the jury. The evidence offered by the plaintiff, tending to show the extent of this injury, ought to have been admitted. It was not competent for the plaintiff to prove the amount of damage by the opinion of experts, but this must be determined by the jury from all the facts; the value of the right, the disturbance of that right; the value of the right subject to the injury caused by the unlawful acts of the defendants, are matters proper to go to the jury. The court below erred in overruling the appellant's motion for a new trial.

In our view of the case, it is unnecessary to pass upon

the effect of the special findings of the jury on the general finding. Substantial justice requires a new trial.

It is assigned, as cross-error, that the court erred in overruling the demurrers to the several paragraphs of the complaint. The objection taken to each paragraph is the lack of an averment that the plaintiff himself was guilty of no negligence.

The first paragraph of the complaint avers that defendants, "without leave, wrongfully entered" upon the lands described, owned by plaintiff, and continuously used, took possession of and broke the wharf boat of the plaintiff, on, attached to, and connected with the land.

The second paragraph avers that plaintiff was the owner, &c., of a certain wharf boat, attached and annexed to the same lands, and that defendants, on the first of *June,* 1867, and daily and continuously thereafter, ran their steamers upon and against the plaintiff's wharf boat, thereby damaging it.

The fourth paragraph avers the ownership of the land and the wharf boat, and a prescriptive right to keep a wharf appurtenant to the land. That defendants, with their boats, unnecessarily and continuously struck against and damaged the wharf boat and obstructed the passage to and from it; and. that they unnecessarily, and without cause, occupied the river in front of the wharf, interrupting and preventing ingress and egress.

The complaint is good, and the court below committed no error in overruling the demurrer. This case does not belong to that class of cases in which it is necessary to aver that the plaintiff was without fault. A custom existing at other places could have nothing to do with the rights of the appellant.

The judgment is reversed, with costs, and the cause remanded, with directions to grant a new trial, and for further proceedings.

*J. Sullivan, T. A. Hendricks, O. B. Hord* and *A. W. Hendricks,* for appellant.

*C. E. Walker,* for appellees.