# SHAW *v.* OSWEGO IRON CO.

WATER COURSES—NAVIGABLE STREAMS.—Where a stream is naturally of sufficient size to float mill logs—and, it may be, small boats over some portion of it—the public have a right to its free use for that purpose. Nor is it essential that such capacity continue through the year; it is sufficient at its periods of high water, or navigable capacity continue a sufficient length of time to make it useful as a highway.

RIPARIAN RIGHTS.—Under the well settled principles of the law, the title to the bed of such stream is in the riparian owners.

APPEAL from Clackamas County.

*James K. Kelly*, for appellant.

*Thomas N. Strong*, for respondent.

By the Court, LORD, J.

This is an injunction bill brought to enjoin the defendant from diverting the water of the Tualatin river from its natural channel, into Sucker lake, for manufacturing purposes. The complainant, Shaw, substantially alleges that he is the owner in fee of a certain tract of land which formerly was a portion of the donation land claim of Ambrose Field, deceased, and that the said land lies at and near the

confluence of the Willamette and Tualatin rivers, the same being bounded one-fourth of a mile on the Willamette river and about a half of a mile on the northern bank of the Tualatin river. That from the upper end of said tract of land, where the same abuts on the Tualatin, to its confluence with the Willamette river, there is a fall in the waters of the said Tualatin river of about twenty feet; that the water flowing in the said river is sufficient, at all seasons of the year, to propel a large flouring and saw-mill, and other machinery; that said water can be diverted on and over such tract of land with little trouble and expense, and by said diversion it will form a water privilege and power of great value, and that the use of the water of said river is now of great prospective value as a motive power to the complainant, as the riparian owner of the said land. That in September, 1880, the defendant commenced to dig and make a canal from the said Tualatin river for the purpose of diverting the water from its natural channel, at a point about five miles above the plaintiff's land, and turning said water into Sucker lake, so that it will not again flow into Tualatin river, and that the defendant has already cut and dug the said canal to such a depth as to cause a large portion of the water in said river to flow from the Tualatin river into Sucker lake; and, furthermore, threatens to make the said canal deeper and wider so as to divert the greater portion of the said waters from its natural channel into Sucker lake. That if the said defendant be permitted to divert and use the said water, in the summer and fall seasons of the year especially, it will cause great and irreparable injury to the plaintiff as a riparian owner of said tract of land, and render the same much less valuable than it now is. The defense relied upon to defeat the injunction is, that the Tualatin river from its confluence with the Willamette river

to a point more than twenty miles from said confluence is, and always has been a public navigable stream, and is entirely within the state of Oregon. The question then presented by this record, and which we are required to decide by this appeal is, whether the Tualatin river is, in the legal sense, a public navigable stream. If it is, it is conceded that the bed of the stream is owned by the state, and that the plaintiff's suit, based on riparian ownership *ad medium filum aquœ*, must fail. As the court is supposed to know judicially the permanent geographical features of the country, it necessarily includes as part of it, what are its public navigable streams. (*Brown* v. *Schofield*, 8 Barb., 239; *People* v. *The Canal Appraisers*, 33 N. Y., 461; *Neaderhouse* v. *State*, 28 Ind., 257; *Ross* v. *Faust*, 54 Ind., 474; *Wood* v. *Fowler*, 26 Kansas; 1 Wharton's Law of Evidence, sec. 339.) And the courts will also take judicial notice of the government surveys, and the legal subdivisions of the public lands. (*Atwater* v. *Schenck*, 9 Wis., 164.)

We know that the lines of the United States survey have not meandered the Tualatin as in the case of the Willamette river, of which it is a tributary, but that the Tualatin river has been sectionized by the government surveyors as though it had no existence; that it has been sold by the government as land, without any reservation or deduction of the bed of the stream, the whole being computed as land and sold as so many acres. We know from such geographies and histories of the state as we have examined, that the Tualatin is not mentioned among the public navigable waters of this state; that about a mile above its mouth there is described a series of rapids over which the water falls from thirty to forty feet, in a distance of a quarter of a mile; that above the rapids it is generally a narrow and tortuous stream with spaces of slack or sluggish water of sufficient depth for

small boats, and in other places shallow, with rocks protrud-
ing except during seasons of high water, and that it is not
at its ordinary stage of water capable of sustaining much,
if any, valuable floatage, but that it is subject to periodical
fluctuations, when the volume and height of its waters are
greatly increased, recurring with the regularity of our wet
seasons, and lasting for several months, and, during which
periods of high water, it is susceptible of being used for
rafting logs to market; and this is not at variance with the
general import of the evidence. We find that in October,
1870, the legislature passed an act authorizing the Tualatin
river Navigation and Manufacturing Company to divert so
much of the stream as might be necessary for the purpose
of maintaining and operating a canal and locks, at or near
Colfax, on the Tualatin, to Sucker lake; that it appears from
the act that "the said Tualatin river can only be made avail-
able for navigation purposes by means of such canal and
locks, and other like improvements," and that the act pro-
vided that "the said company shall, in all cases, pay the
owner, or owners of land damaged by the construction of
said canal, such damages as courts of competent jurisdiction
may, in any and all cases, award to parties aggrieved." We
ascertain from the evidence that the company, in pursuance
of this act, did make some improvements in the navigation
of the river, constructed a canal to divert the waters of the
Tualatin to Sucker lake, and succeeded to float a small
steamboat on the river for a short time. But the locks
were never built as required by the act, the navigation of
the river seems to have proved a failure, and no attempt has
been made to navigate it since in such mode; the company
became involved, then insolvent, and finally, its property
was sold on execution, since which time it has ceased to do
business, or keep up its organization. We are satisfied from

an examination of the evidence that during certain period-
ical seasons of high water the Taulatin does possess a quali-
fied capacity for floatage, and that it is susceptible of being
used to float logs or timber to market, and, perhaps, to float
small boats over certain portions of it, and that the products·
of the forest in the region which it penetrates can be made
available for market by using it for that purpose. That it
has, in fact, been used for rafting logs to market, is mani-
fest from the decision of this court in the case of *Wise* v.
*Smith*, 3 Or., 448, as it is equally manifest that the court
considered it as having the character of a highway *for that
purpose*, although in that case, the portion of the river used
for rafting logs was only four or five miles above its mouth.
But the question occurs: Does such a floatage place the
Tualatin upon a footing with public navigable waters, so as
to confine the riparian ownership to the margin of the river?
At the common law, all rivers in which the tide ebbs and
flows are denominated navigable rivers, but above the flow of
the tide water when they are of sufficient natural depth for
valuable floatage, they are denominated public highways, and
the public have only an easement therein for the purposes
of transportation and commercial intercourse. Accordingly,
streams of water have been divided into several distinct
classes. First, Such rivers, or arms of the sea in which the
tide ebbs and flows; and in these, which are technically
called navigable; the sovereign is the owner of the subjacent
soil, and all right in it belongs exclusively to the public.
Second, Such streams as are navigable in fact for boats, ves-
sels, or lighters; and in these, which are termed public
highways, the public have an easement for the purposes of
navigation and commerce, but the title of the subjacent
soil to the middle of the stream, and the right to the use of
the water flowing over it is in the riparian owner, subject

to the superior rights of the public to use it for the pur-
poses of transportation and trade. Third, Such streams
as are so small or shallow as not to be navigable for any
purpose; and in these the public have no rights of highway
or otherwise, and they are altogether private property.

The Tualatin river is not a stream in which the tide ebbs
and flows, and in the common law sense is not navigable. It
is a fresh water stream, of which Lord Hale says, in his trea-
tise *De Juris Maris*, "do of common right belong to the
adjacent owners," but which, nevertheless, may be under
servitude to the public interests for the benefit of trade and
commerce. But the great size of many of the fresh water
rivers of this country, and their capability of navigation be-
yond anything known to the common law, have induced
some of the highest courts of several of the states to attach
to such rivers the common law consequences of navigability,
and thereby abrogating the common law distinction between
such rivers and those in which the tide ebbs and flows, so that
grants bounded upon them stop at the margin of such rivers.
The reasons which these courts have thought sufficient to jus-
tify the limiting of riparian ownership to the margin of such
rivers and whether high or low water mark is not always
indicated, are, First, that when lands are granted by the
government bounded on navigable fresh water rivers, and
from the terms of the grant nothing appears to indicate the
intention of the government to part with the bed of the
river, the grantee does not take *usque ad filum aquæ*, and
that this intention is sufficiently evinced when the bed of
the river is not included in the survey by the government
surveyors; and Second, that only so much of the common
law is adopted in this country as is adapted to our condition,
and consistent with the spirit of our institutions, that the
common law doctrine of the flow and reflow of the tide as a

criterion for determining what rivers are public, was framed with special reference to the physical condition of a country widely different from our own, and must necessarily prove an imperfect standard when applied to the great fresh water rivers of the United States, and is, therefore, inapplicable to such rivers, and either forms no part of our common law as to them, or is an exception to its principles. As a result, these courts have held that upon the large fresh water rivers which are navigable in fact, the riparian owners do not take to the middle of the river, but that the state is the owner of the subjacent soil, and the public have an easement in the river. (*Shrunk* v. *The President, &c.*, 14 S. & R., 79; *Carson* v. *Blazee*, 2 Binney, 477; *Flaumgain* v. *City of Philadelphia*, 42 Penn. St., 219; *McManus* v. *Carmichal*, 3 Iowa, 57; *Haight* v. *Keokock*, 4 *id.*, 215; *Tomlin* v. *Railroad Co.*, 32 *id.*, 106; *Musser* v. *Hershley*, 42 *id.*, 356; *People* v. *Canal Appraisers*, 33 N. Y., 461; *Bambridge* v. *Shirlock*, 29 Ind., 364; *Wood* v. *Fowler*, 26 Kansas, 682; *Bullock* v. *Wilson*, 2 Dev., 30; *Collins* v. *Bentbury*, 3 Ind., 277; *Cates* v. *Wadlington*, 1 McCord, 580; *Bailey* v. *Railroad Co.*, 4 How., 389; *Thurman* v. *Morrison*, 14 B. Munroe, 249; 17 *id.*, 367; *Benson* v. *Morrow*, 61 Mo., 350.)

It is noticeable, too, that for some time the supreme court of the United States refused to declare the great lakes and other navigable fresh water rivers entitled to be denominated as navigable waters, and amenable to admiralty jurisdiction. But in the case of the *Genesee Chief*, 12 How., 446, the court overruled the reasonings and decisions of two generations, and declared that the admiralty and maritime jurisdiction given by the constitution of the United States is not limited to the high seas and tide waters, or waters navigable from the ocean, but embraces our great mediter-

ranean seas, bordered as they are by different nationalities, as well as different states of the union. And in *Barney* v. *Keokuk*, 94 U. S., 324, Mr. Justice Bradley said: "The confusion of navigable with tide water, found in the monuments of the common law, long prevailed in this country, notwithstanding the broad difference between the extent and topography of the British island and that of the American continent. It had the influence of two generations of excluding the admiralty jurisdiction from our great rivers and inland seas, and under the like influence it laid the foundation in many states of doctrines with regard to the ownership of the soil in navigable waters, above tide water, at variance with sound principles of public policy. Whether as rules of property it would now be safe to change these doctrines where they have been applied, is for the several states themselves to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections." (*Railroad Co.* v. *Schurmeir*, 7 Wall., 289.) So that it is settled now in that court that the doctrine of the common law as to the navigability of waters has no application in this country. "Here," say the court, "the ebb and flow of the tide do not constitute the usual test, as in England, or indeed, any test at all, of the navigability of waters. Those rivers must be regarded as public navigable rivers in law, which are navigable in fact, and they are navigable in fact when they are used, or susceptible of being used in their ordinary conditions as highways for commerce over which trade and travel are, or may be conducted, in the customary modes of trade and travel on water." (*The Daniel Ball*, 10 Wall., 557; *The Martello*, 11 Wall., 415; 20 Wall., 439.)

There is, however, a strong array of authorities opposed

to the view taken by these courts. Eminent tribunals of other states, regarding the binding force of the common law on which American jurisprudence essentially rests, have maintained with great firmness and learning, as a part of it, the common law rule of navigable waters. Nor have they deemed the greater size of the American rivers as furnishing any sufficient reason to depart from the common law rule, which Hosmer, J., says, "promotes the grand ends of civil society, by pursuing that wise and orderly maxim of assigning to everything capable of ownership, a legal and determinate owner." They have, therefore, held to the strict application of the common law rule that only those rivers in which the tide ebbs and flows, limit grants of lands adjoining to high water mark, and that in all others, without regard to size or capabilities for transportation and commercial intercourse, the middle of the river is the boundary of lands on either side. (*Adams* v. *Pease*, 2 Conn., 481, 484; *Chapman* v. *Kimball*, 9 *id.*, 39; *Magnolia* v. *Marshall*, 39 Miss., 110; *Ingraham* v. *Wilkinson*, 4 Pick., 268; *Commonwealth* v. *Chapin*, 5 *id.*, 199; *Knight* v. *Wilder*, 2 Cush., 199; *Lorman* v. *Benson*, 8 Mich., 18; *Ryan* v. *Brown*, 18 *id.*, 196; *Watson* v. *Peters*, 26 *id.*, 517; *Bay City Gas Light Co.* v. *Industrial Works*, 28 *id.*, 182; *Jones* v. *Pettibone*, 2 Wis., 308; *Walker* v. *Shepardson*, 4 *id.*, 486; *Manner* v. *Schutti*, 13 *id.*, 692; *Olson* v. *Merrill*, 42 *id.*, 210; *Brown* v. *Chadbourne*, 31 Maine; *Granger* v. *Avery*, 64 Maine, 292; *Stewart* v. *Clark*, 2 Swan., 12; *Gavill* v. *Chambers*, 3 Ohio, 496; *Benner* v. *Platter*, 6 *id.*, 505; *Blanchard* v. *Porter*, 11 *id.*, 138; *Walker* v. *Board of Public Works*, 16 *id.*, 540; *June* v. *Purcell*, 36 Ohio St., 396; *Middleton* v. *Prichard*, 3 Scam., 510; *Board of Trustees* v. *Haven*, 5 Gilman, 548; *City of Chicago* v. *Laflin*, 49 Ill., 117; *Braxton* v. *Brusler*, 64 Ill., 488;

*Browne* v. *Kennedy*, 5 H. & J., 195; *Schurmeier* v. *Railroad Co.*, 10 Minn., 102; *McCullough* v. *Wall*, 4 Rich., 68; *Greenleaf* v. *Kilton*, 11 N. H., 531; 3 N. H., 321; *Gough* v. *Bell*, 1 Zal., 160; 2 *id.*, 455; *Bell* v. *Gough*, 3 *id.*, 656.)

Now it must be evident that some of the facts or reasons which have induced the courts of some of the states to ignore the common law distinction between the great fresh water rivers of the country which are navigable in fact for the transportation of passengers and property, and are essential to commercial intercourse, and those in which the tide ebbs and flows, and as a result thereof, limiting riparian ownership to the margin of such rivers, can have any application to the Tualatin river; yet to maintain his position that the bed of this river is the property of the state, and the riparian owners stop at its margin, the respondent must, at least, bring his case within the reason of these authorities, and the conclusions upon which they are founded. These are drawn, as before stated, from the inapplicability of this rule of the common law to *large* fresh water rivers, and also from the fact that the government has never granted the beds of such rivers to individuals. But the bed of the Tualatin river was not reserved; it was sectionized as land, and sold and patented by the government without any deduction or reservation whatever of the subjacent soil of the Tualatin. Nor do the reasons of the inapplicability of the common law rule to the large rivers and inland seas apply to such streams as the Tualatin. It was the imperfect standard that rule furnished as a test of navigability when applied to the large fresh water rivers and inland seas, abounding on this continent, and navigable in fact, and "over which trade and travel are, or may be, conducted in the customary modes of trade and travel on water," to which

these courts held that rule to be inapplicable, and declared that such rivers must be regarded as public, navigable rivers in law. Manifestly, the Tualatin does not come within the reason of the courts which excepted such rivers from the strict common law principle, and limited riparian ownership to the margin of them. There can be no difficulty in adapting well established principles to fresh water streams of the character and capacity of the Tualatin. Such streams, having at best but a limited capacity for floatage, occurring at regular seasons of high water, and at which times may be useful to trade and the interests of the community, can be used as highways by the public for that purpose, leaving in the riparian owners all rights of property, not inconsistent with such use of the public. This principle is ably declared in *Morgan* v. *King*, 18 Barb., 288, in which the court say: "The capacity of a stream which generally appears by the nature, amount, importance and necessity of the business that can be done upon it, must be the criterion. A brook, although it might carry down saw-logs for a few days, during a freshet, is not therefore a public highway. But a stream upon which, and its tributaries, saw-logs to an unlimited amount can be floated every spring, and for the period of from four to eight weeks, and for the distance of one hundred and fifty miles, and upon which, unquestionably, many thousands will be annually transported for many years to come, if it be legal to do so, has the character of a public stream *for that purpose*. The floating of logs is not mentioned by Lord Hale, and probably no river in Great Britain was in his day, or ever will be, put to that use. But here such is common, necessary and profitable, especially while the country is new, and if it be considered a lawful mode of using the river, it is easy to adapt well settled principles of law to the case." That this

mode is considered lawful, to use such streams for that purpose, leaving in the riparian owner his rights for every purpose not inconsistent with that public use, is well settled by authority and in this state.

In an early case in Maine, the doctrine was stated by Parvis, J., that where a stream is naturally and of sufficient size to float boats or mill logs, the public have a right to its free use for that purpose. (*Wordsworth* v. *Smith,* 2 Fairfield, 278; *Brown* v. *Chadbourne,* 31 Maine, 20.) And the same rule has been adopted in Michigan and Wisconsin. (*Moore* v. *Sandborne,* 2 Mich., 521; *Thunder Bay,* &c., v. *Speechly,* 31 Mich., 342; *Whistler* v. *Wilkinson,* 22 Wis., 572.) Nor is it essential to the public easement that such capacity continue through the year; it is sufficient if its periods of high water, or navigable capacity, ordinarily continue a sufficient length of time to make it useful as a highway. (*Treat* v. *Lord,* 42 Maine, 558; *Morgan* v. *Smith,* 35 N. Y., 459; *Deidrich* v. *N. W. R. Co.,* 42 Wis., 203.) All these cases recognize the riparian ownership to the middle of the stream, subordinate to the public easement. In *Wise* v. *Smith,* 3 Or., 446, this identical stream was recognized as subject to the public easement for rafting logs to market, and the reasoning of the Maine authorities was quoted and approved. To the same effect is *Felger* v. *Robinson,* 3 Or., 458, in which it is held that any stream in this state on the waters of which logs or timbers can be floated to market, that they are public highways *for that purpose;* that it is not necessary that they be navigable the whole year for that purpose to constitute them such. It is sufficient if they can be used for floating timber during the seasons of high water. There is not a suggestion that the bed of such streams is owned by the state; on the contrary, the doctrine of the law, as applied in these

cases, and the authorities cited and approved, recognize the right of the riparian owner to the middle of the stream, subject only to the public servitude. It is, perhaps, proper to remark that the facts of this case, not coming within the exception to the common law principle adopted by some of the courts of the Union, no opinion is intended to be expressed upon that point. As a consequence, however, of the law applicable to this case, the decree of the court below must be reversed and the defendant enjoined from diverting the waters of the Tualatin from its natural channel, and it is so ordered.

Decree reversed.