THEODORE F. KING et al.

*v.*

JOHN P. MULLER.

[Submitted April 12th and June 21st, 1907. Decided June 27th, 1907.]

1. The waters of a lake were so raised by a dam built across its outlet that a swamp about three thousand feet long and from two hundred to five hundred feet wide, which had previously been separated from the

lake by a causeway, was flooded to the depth of about three feet at high water. The trees were so thick that the swamp was at first scarcely navigable, even by small rowboats, but after removal of some of the trees and decay of the stumps it was frequented by small boats and fishermen. Complainants, under an exclusive grant from the owner of the land comprising the swamp of the right to do so, dredged a channel from the lake proper across the causeway and swamp to their property, abutting on the swamp, such channel being about thirty feet wide and three thousand feet in length, built a dock on their own land, and dug a basin, so that boats might be turned. This channel was at all stages of the water navigable, and did not interfere with any improvements looking towards the betterment of the navigability of the swamp which had theretofore been made, nor were any of such improvements necessary to its use.—— *Held,* that the right of the public to navigate the lake proper did not extend to the swamp on its being flooded, and that the public was without right to navigate the channel dredged by complainants across it, and might be excluded therefrom.

2. Where the public is without right to navigate a channel dredged by complainants from the main body of a lake to a point on complainants' land, an injunction to restrain navigation thereof will lie, that complainants may be afforded adequate relief, and to save a multiplicity of actions.

On order to show cause upon bill and affidavits and answer and affidavits.

*Mr. William H. Corbin, Mr. Edward A. Quayle* and *Mr. Elmer King,* for the complainants.

*Mr. Sherrerd Depue, Mr. Thomas M. Kays* and *Mr. Richard L. Edwards, Jr.* (of New York), for the defendant.

PITNEY, ADVISORY MASTER.

The questions involved in this cause are important and have been argued on each side with great ability and industry.

The case is developed by bill, answer and affidavits and exhibits on each side.

The original order, with restraint, in the cause was made on the 15th day of September, 1906, and the parties seem to have been sufficiently industrious in collecting *ex parte* affidavits on each side and producing records, maps, &c., so that at the hearing it was not suggested that the case could be seriously changed by a final hearing.

3

The complainants' bill sets forth title to certain lands, and on its presentation there was exhibited record evidence of such title. The defendant, by his answer, formally denied the title, but set up none on his part adverse thereto, and at the hearing I understood counsel for the defendant to substantially admit the title as asserted by the complainants, and to rest his case on other grounds.

The object of the bill is to restrain the defendant from navigating, with a passenger power boat, a certain channel or canal about thirty feet in width and three thousand feet in length, created by the complainants in a shallow arm or bay of Lake Hopatcong, and leading from what may be termed the main body of the lake to a point in the most southeasterly portion of its waters, including the arm, near Hopatcong station, on the Delaware, Lackawanna and Western railroad.

Lake Hopatcong is a natural lake enlarged by a dam or dams built at various times across its outlet, by which its waters have been raised until it has attained its present size. It is quite irregular in shape, but much longer than it is wide, and in its deeper portions so deep as to indicate what is sustained by tradition that there was in its central portion at one time a natural lake. It lies just to the west of the high mountain ridge, which at that point divides the watersheds of the Delaware and the Raritan rivers at the southerly end of the lake, and those of the Delaware and the Rockaway rivers on the north end of it.

The lake is fed at its upper end by a small brook, and its outlet is the Musconetcong river, leading to the Delaware river.

A short distance south of its natural outlet there is a natural depression, or pass, in this high mountain ridge at an elevation of about nine hundred and ten feet above the sea, and about fifteen or twenty feet below the level of the lake when it is full, which is nine hundred and twenty-six feet above tide level. Through this pass the Morris canal was located and built about the year 1830–1831. By building a navigable feeder from the natural outlet of the lake along that level to the level of this pass the water of the lake is let into a level of the canal at that point, which is about fifteen feet lower than the level of the lake at high water, and from thence the water may be turned,

and in point of fact is turned each way in the canal to the waters of the Delaware on the west and to the Hudson on the east.

When the canal was laid out and built, a dam, called the "Randolph dam," already existed at the outlet of the lake, and was used to drive a forge.

The name of that place was Brooklyn, and the pond itself was known as "Brooklyn pond," or, as expressed in the charter of the canal company, the "Great pond," as well as "Lake Hopatcong."

The canal company, by its charter, was obliged to file in the clerk's office of the various counties through which it passed maps showing the amount and description of the lands intended to be taken or flowed by it in that county.

The map showing the land to be taken in the neighborhood of Lake Hopatcong is still in existence, in the clerk's office of Morris county, and was used, by consent, at the hearing. That map shows the extent of the flow at the time the company made its survey, and the extent to which the flow of the land around the lake was to be increased by its dam. It showed a very little increase of flowage in any direction. Its importance in this connection is that it shows that at what was then the most southerly part of the lake and about five-eighths of a mile southeast of the outlet, there was a causeway by the water's edge over which passed a mountain road running along the easterly side of the lake, and around what was then the southwesterly end of the lake to the outlet at Brooklyn. The remains of that causeway are still in existence, as shown by the map made for the purpose of this hearing, and proven by abundance of affidavits and not disputed by anyone on the part of the defendant. South of that causeway the canal company's map shows no flowage, and the canal company did not claim that it desired to acquire the right to flow south of that causeway.

The well-known object of the canal company was to create a reservoir for the storage of water to be used in the operation of its canal during the dry season.

The evidence shows that in point of fact there was no flowage at that time south of that causeway. But there was a swamp about three thousand feet long and from two hundred to five

hundred feet wide, called the "cedar" or "spruce" swamp, leading in a southerly direction from this causeway and at right angles to the general course of the lake and river, and reaching to the very edge of the pass or depression in the mountain before mentioned.

Immediately to the south of this swamp the land begins to fall off in a southerly direction toward the headwaters of a branch of the Raritan river, and a small stream rose there leading down ultimately to that river. No stream or brooklet was running through this swamp.

Later on, and in or about the year 1836, the canal company, finding the storage furnished by the dam and lake, as completed in or about 1830, not sufficient to supply its boats in dry seasons in August and September, raised the dam several feet higher. This raising was proven by one of the old witnesses in this case called by the defendant. The result of this raising was that the causeway before mentioned was flooded with water in the spring of the year and produced the litigation reported in the case of *Seward* v. *Morris Canal and Banking Co., 23 N. J. Law (3 Zab.) 219.* (That cause related to land at the northerly end of the lake and was tried twice. The first trial resulted in a verdict for the defendant and was set aside by the supreme court, as against the weight of the evidence. On the second trial a verdict was rendered for the plaintiff, which was sustained by the court on a rule to show cause, as reported, where the reporter has reversed the position of the counsel.)

With the flooding of the causeway before mentioned at the south end the whole cedar swamp was flooded, and the apparent area of the lake increased, and it is laid out on the maps as being an extension or arm of the lake running to the southward.

The road, which formerly crossed the causeway and led to and from Brooklyn, was abandoned at that point, and a substitute road was constructed around this arm and along the southerly bank of it, and so on northwardly to the outlet.

The water stood, according to the evidence, between the trees of this arm, or bay, about three feet deep at high water, but the

trees were so thick that it was scarcely navigable, even by small rowboats.

The owners of the land took advantage of the freezing of the waters in the winter to cut off the cedar trees and ship them to market, leaving the stumps, of course, considerably higher than high-water mark. After that, and after the decay of the brush and smaller stumps, this arm became, during high water, navigable in a measure by small rowboats and frequented by fishermen.

Meantime, after the foreclosure of the Dutch mortgage, from the proceeds of which the canal was originally built—*3 Gr. Ch. 381 (1843)*—the canal company was reorganized, and it was in some respects, especially as to the machinery of its inclined planes, rebuilt and made much more efficient, and did a great deal more business from that time forward until within a very few years, when the business has very much diminished.

During its period of greatest activity it drew on Lake Hopatcong very largely in the later summer and fall months, reducing its level from five to eight feet each year.

The result of this annual draft was that the bay, or arm, in question was completely drawn out and in the main quite dry, and, of course, entirely incapable of navigation.

Later on, the building of the Lackawanna railroad through this pass and close to the south side of the canal began to attract visitors and summer residents from a distance, and led to a great increase of small fishing and pleasure boats on the lake.

I should have stated that the difference in level between the canal and the lake waters was overcome by a lock at the outlet, and through this lock boats from the canal entered into and departed from the lake and a large trade was conducted from the northern head, or near the head of the lake, in ores mined in that neighborhood, and also in wood cut for market and floated in boats down the canal. These boats were towed by a steam tug through the lake to the outlet. Later on, and in or about the year 1878, a small passenger steamboat was put on the lake to carry passengers from different points to a station established on the railroad, called "Hopatcong Station," which this boat reached by locking down into the feeder and thence into the

canal, and thence along the canal to the railroad station, near which was a canal basin.

Later on other boats of the same kind were put on the lake, all making use of the canal and canal feeder to carry a small load of passengers from different points on the lake to the railroad station. They were limited in size by the lock.

About this time the complainants, the brothers King, purchased land at the southerly end of the cedar swamp bay, or arm, and between that and the canal on the highway before mentioned, and started a mercantile business and procured a post-office to be established, called "Landing."

In the year 1885 a canal company was formed under the General Canal act, the official map of which showed the laying out of a canal from the main body of the lake, just north of the west end of the causeway previously referred to, along the western boundary of the cedar swamp bay, or arm, to the public road at Landing, all which appears by a copy of the organization certificate. The promoters of this scheme were gentlemen of some means, who were interested in real estate on the borders of the lake, and desired a more expeditious and commodious water connection with the railroad than was offered by the canal, and, also, it may be supposed, wished to avoid the tolls which they were obliged to pay the canal company. One thousand dollars was invested by the promoters in this venture, of which they spent $934 in digging a narrow channel through a point of land called "Clambake Point," just northwest of the northwesterly end of the causeway, which formed a cape at the junction of the arm of the lake with its main part. Beyond that they did nothing; abandoned the project, stopped paying the state tax, with the usual result.

In 1886, one Captain Cook and a Mr. Edwards brought onto the lake a small flat-bottomed, stern-wheel steamboat, with the propeller so arranged that it could be raised and lowered, which was supposed to draw twelve inches of water, and attempted to carry passengers by the cedar swamp route from Landing to the north end of the lake at Woodport. They found great difficulty in getting the boat through and over the stumps and

were unable to make regular trips, and the enterprise was a failure.

A company was then formed (1890), or, perhaps, had been formed while the canal company's excavation was being done, called the "Hopatcong Steamboat Company," and a year or two after the complete collapse of the canal company just mentioned, this navigation company undertook to create a channel for a small shallow-draft steamboat which it purchased, and with that view rigged up a crude stump puller and succeeded in pulling out some of the stumps along in the west side of the arm, or bay, over what had been laid out as the bed of the proposed canal, and at high water succeeded in making a few trips with its boat down to the southerly end of the bay, or arm, at Landing, opposite Hopatcong station, on the railroad. The few passengers they brought down were taken across the canal in a rowboat to the station. As the navigation of the bay became impossible, as it did by the draft of the water for canal purposes, the navigation company's boats stopped at a point on the lake just north of the causeway at the mouth of the arm of the lake, and the passengers were carried in wagons around the east side of the bay to the railroad station.

The land in the greater part of the bay, and far to the east of it, is owned and in the possession of the American Forcite Powder Manufacturing Company, a manufacturer of high explosives. Its land did not, however, extend so far as to reach the site of the old proposed canal.

In the meantime, in the year 1891, the complainants, King, or the Hopatcong Steamboat Company, procured to be brought onto the lake a heavy, expensive and efficient dredging machine, and proceeded, with the consent, and later on under a written contract, with the powder company, to excavate, at great expense, a channel from the deep waters of the lake across the old causeway, near the easterly end thereof, and quite to the east of the route and site of the old proposed but abandoned canal, in a southerly direction towards their property at Landing, extending it quite to Landing, and there excavated a sort of basin, making room to turn boats. They then made an arrangement with the navigation company for the use of this channel by that

company, which, as demand warranted, increased their fleet of boats and enlarged their size. The fleet so created was called the "White Line," and those boats, which still used the canal, other than the private boats, were called the "Black Line." In the meantime the number of private power boats on the lake increased.

Almost from the start the complainants demanded and re-. ceived tolls for boats desiring to use their channel, and, among others, from the boats owned by the defendant. The complainants retained the dredge which they had used in making the original excavation and found themselves obliged, from year to year, to clean out the channel and to deepen it to accommodate the increased size and draft of the boats which were using it.

They also built a substantial dock on their own land for the use of boats in landing.

A very small and necessarily cheap dock had been built at the terminus of the old proposed canal, located a few feet away and to the west of the new dock built by the complainants. This old dock was built by the defunct canal company and was added to and extended farther out into the lake by the complainants, upon whose land it stands.

A later and apparently accurate map was made from actual survey by Mr. Howell, a civil engineer, in March, 1907, which was used at the hearing, and which shows the whole state of affairs very clearly. It shows both the center line of the canal proposed by the old canal company and the channel dredged by the complainants, and shows that the channel dredged out by the complainants does not interfere with that proposed by the old canal company, and in nowise obstructs the results in the way of promoting navigability of the work done by the navigation company in the way of pulling stumps on the west side of the bay previously referred to.

The result of this dredging was to throw up an embankment above the level of the water on one side or the other of the channel, but the map shows that this embankment did not encroach upon that old so-called channel.

One other matter should be mentioned. The grant or lease from the powder company to the complainants of the right to

excavate and maintain the channel across its lands grants to them the exclusive right so to do.

Shortly before the bill was filed the defendant insisted upon using the channel and new dock with his boats against protest by the complainants and without the payment of tolls.

The question presented by the pleadings is whether the complainants have the right to exclude the defendant from the use of this channel.

That the inland waters of. this state are private property is as well settled as anything can be.

That the ground on which the docks and turning point for the steamboats of the complainants are on their property, to which they show title from the proprietors, is perfectly clear was shown by a chain of documentary evidence at the hearing, and was, as before remarked, admitted by counsel for the defendant in argument.

That where the channel was not covered by the title of the complainants to the soil it was made by the express and exclusive grant of the powder company, who were the actual owners of the soil, was clearly shown and admitted by counsel for the defendant.

The defendant, while in his answer denying formally the title in the complainants, put himself in argument on the ground that all the waters of Lake Hopatcong are public waters, in the sense that the public have the right to navigate them, and that the ownership of the soil is subject to this right of public navigation.

His counsel contended that granting that this particular part of the lake was not originally in its natural condition covered with water, yet that when by the increase in height of the dam at the foot of the lake the water was flooded in high-water seasons over this cedar swamp, the admitted navigability of the main part of the lake was extended to this arm of the lake, although the flooding of the same was entirely unlawful and merely acquiesced in by the owners of the soil, and that the same principle applies, although the navigation was confined to small rowboats during only a part of the year; and he further contended that when the complainants expended a large sum of

money, nearly or quite ten thousand dollars, in creating this artificial channel, or canal, three thousand feet long and extending from the lake proper to their own village of Landing and excavated it to a depth sufficient to make it navigable when the rest of the bay was perfectly dry, they at once dedicated it to the public, or that in some way the right of the public in the lake proper extended to this artificial channel.

This proposition is a startling one.

In dealing with it I do not feel called upon to discuss or determine the rights of the public in the lake proper. It may be that the fact that it is in point .of fact navigable for boats large enough for commercial purposes at all stages of the water for some three or four or five miles, measured lengthwise on its surface, and that it has for fifty years or more been used as a navigable body of water in connection with the Morris canal for purposes of commercial navigation, has given the public some rights to use it as a public highway. But, granting all that, I am unable to perceive how it affects the question here involved or helps the defendant in the least.

In order to sustain his position. the defendant must establish an easement on the part of the public in the lands of the complainants. He must show an absolute right on the part of the public to navigate the particular canal which the complainants have created, and which is confessedly in its nature, so to speak, private property.

The case is entirely distinguishable from that of *The Montella, 20 Wall. 430,* relied upon by the defendant. That involved only the right of the United States to impose upon the owner of a vessel a license under an act of congress, and did not involve private rights. The discussion covered the history of the navigation, partly natural and partly artificial, created between the Mississippi river and Lake Michigan.

We start here with, for all practical purposes, a perfectly dry piece of land three-quarters of a mile long and less than a quarter of a mile wide. One end of it touched an artificial lake. The other end stopped in a forest. It was not in the line of any commercial route. It was not even a portage made use of by traders, like that in *The Montella Case.* It was simply

an impenetrable forest. And after the second raising of the lake, when it was flooded in high water, it was decidedly not navigable in the sense in which that word is used in the books. The fact that after the trees had been cut down, and after the smaller trunks had rotted away, fishing boats could work their way through between the stumps, did not make it navigable in the sense just referred to.

Chief-Justice Shaw, in *Rowe* v. *Granite Bridge Corporation, 21 Pick. (Mass.) 344* (at *p. 347*), expressed himself on this subject. He was there dealing with a small tidewater creek and used this language: "It is not every ditch, in which the salt water ebbs and flows, through the extensive salt marshes along the coast, and which serve to admit and drain off the salt water from the marshes, which can be considered a navigable stream. Nor is it every small creek, in which a fishing skiff or gunning canoe can be made to float, at high water, which is deemed navigable. But in order to have this character it must be navigable to some purpose, useful to trade or agriculture. It is not a mere possibility of being used under some circumstances, as at extraordinary high tides, which will give it the character of a navigable stream, but it must be generally and commonly useful to some purpose of trade or agriculture."

That language is quoted with approval by Mr. Justice Davis, speaking for the supreme court of the United States in *The Montella Case, supra.*

The present case is in marked contrast with those of large streams which are navigable for floating logs though obstructed by rifts and rapids, like our own Delaware river and like the Connecticut river, which latter was dealt with in an elaborate opinion with a copious citation of authority in *Connecticut River Lumber Co.* v. *Olcott Falls Co., 21 Atl. Rep. 1090; 65 N. H. 290.*

I am unable to find any authority which holds that a piece of land like this, not in the line of any general commercial travel and never used as a portage, can ever become the subject of a public easement of this character. Justice Davis, in *The Montella Case, supra,* states the criterion to be whether the river in its natural state is such that it affords a channel for useful commerce.

And Mr. Farnham (volume 1, page 100), cited by the defendant, says:

"A navigable body of water is one which the public has a right to use for the purposes of navigation. The term includes all waters which for a period long enough to be of commercial value are of sufficient capacity to float water craft for the purposes of commerce, or to float to market the products of the country through which the water extends, so as to be useful to the population along its banks. * * * The stream must be of some value to trade, commerce or agriculture. And this excludes waters which are merely capable of floating a skiff for pleasure. And to be useful for these purposes the water must connect with other waters or lead from one public place to another, so as to be in the path of commerce. So, a stream is not navigable so as to be a public highway which leads from a public river to a private house, or to which the public have no access except at one point, where a highway approaches it. In order to be public it must have a terminus by which the public can enter it, and another from which it can leave it. But a stream to be public need not lead from one county to another. The rights of the public are entirely dependent on the capacity of the stream for navigation."

And Mr. Farnham again (volume 3, page 2407), says:

"If a new channel created by the riparian owner becomes obstructed, the public has a right to force a way along the old one, causing no unnecessary injury. The same rule does not apply in case of a mere improvement of the natural channel so as to render it navigable when it was not so before. The public has no right to use a stream which is not navigable in its natural condition, and in case the riparian owner makes it navigable for his own purpose, he may exclude the public from the use of it in its improved condition."

A case relied on by both parties is *Holden* v. *Robinson Company, 65 Me. 215.* There a stream was made floatable for logs by putting a dam across it. The court said: "The first question is whether the stream is floatable without the dam. If it is not, the plaintiff could not avail himself of the fact that it is made so by defendant's dam. If the stream was originally private property, exclusively so, any improvements made upon it by the owner would give the public no rights in it. But if, on the other hand, the stream is by nature floatable, those who have occasion to use it as such may do so, and may also have the benefit of such improvements as may be put upon it, having reasonable regard to the rights of the owner. The character of the stream

cannot be changed by the improvements put upon it. A floatable stream may be private property, but its use as such must be subject to the easement of the public."

Defendant relies upon a class of cases where a stream or river of considerable length at the very point and place where it was previously navigable is rendered more easily navigable by a riparian owner by blasting out rocks or straightening a difficult channel, and where the identity of the channel is not changed. Those cases have no application to the present case, which in its nature is entirely distinct from that class of cases.

In those cases the party spending his money in improving the channel could not have the exclusive benefit of the money he had spent without excluding the general public from their admitted right to pass and repass over the difficult waterway.

The defendant relies upon the fact that a canal was projected from the lake along the western side of the bay here in question to the highway at Landing, as I have before mentioned. But I am unable to draw any inference from that circumstance favorable to the defendant's claim. In the first place the proposed canal, if it had been constructed, would have been the property of the corporation, and that corporation would have been entitled to charge tolls upon it. The act makes no provision for the amount of tolls. But on familiar principles they must have been reasonable. The language is "to use and let to others to use said canal and to charge tolls;" and further, "to do any other act necessary for the full and free use and enjoyment by any such canal company of the franchises hereby granted." *Rev. Gen. Stat.* (*1877*) *936* § *1.* The grant to them of the right to condemn, of course, subjected them to the duty of accommodating the public on reasonable compensation. But it must be remembered that that company never did anything to improve the navigation in the bay here in question. It cut across a piece of land forming a cape between the main body of the lake and the bay in question, and it spent a little money in building a small piece of wharf on the land of the complainants. On the demise of the infant canal company, if not before, that wharf became the property of the complainants, but neither the wharf nor the little cut across the cape is necessary for the use

of the canal here in question, nor is it, in point of fact, used in connection therewith.

The complainants have built an entirely independent and additional wharf for use in connection with their canal, and, as before remarked, Mr. Howell's survey shows very clearly that the work they have done has not infringed upon either the territory included within the lines of the proposed canal of 1885, nor has it occupied or obstructed whatever was done in the way of improving the navigation of the westerly side of the bay by the old steamboat company of 1890 or 1891. In short, the complainants' work is a creation, making at great expense a canal navigable at all stages of the water and not interfering with such improvements in navigation, by whomever made, as had in fact been previously made in the bay in question.

The defendant's counsel, in his brief, has cited numerous authorities in some of the western and southwestern states, of which I can find none which reach the present case, and therefore it is not necessary for me to criticise any of them further than to say that so far as some of them may appear to favor his very ingenious line of argument, I find myself doubting if their reasoning is sound.

One other observation on the law. The state and the king hold all rights in navigable waters in trust for the people. Hence the king could not extinguish those rights in favor of an individual. Bearing that in mind, I call attention to the case of *Juxon* v. *Thornhill, 3 Cro. (Charles) 132.*

That was a suit for tolls brought for the navigation of the river Ouse. It appeared that the plaintiff had made the river navigable by the use of locks and the king had granted him the right to take certain tolls and suit was brought therefor. Verdict went against the defendant, and then a motion was made in arrest of judgment

"because the river Ouse is a common river and it is not lawful for any to make stop upon the river or to take money for the passage through the locks. *Sed non allocatur* for the locks are upon the plaintiff's land and at his cost for the exaltation of the water and making the river navigable for vessels of burthen."

And in *Colton* v. *Smith, Cowp.* 47 (*1774*), before Lord Mansfield, there was an action for tolls for goods landed on plaintiff's manor not at a wharf, and he was held entitled to recover.

Mr. Gould, in his book on *Waters,* cites these two cases, and Lord Hale, *Wadsworth* v. *Smith, 11 Me. 278,* and *Holden* v. *Robinson, supra,* in favor of the proposition—

"If the navigation of the river which was originally navigable, in fact to a greater or less extent, be improved by the act of riparian owners in deepening the channel, the public have the right to use it for all purposes to which it is suited in its improved condition. But if, being originally unnavigable, it is made navigable by the riparian proprietor, the public right does not attach."

In the present case whatever of navigability had been given to this part of this bay has been given to it by the riparian owners, the complainants.

I find it impossible to adopt, for a moment, the notion of the learned counsel that the navigability of the main lake, which arose from the Morris Canal Company's first dam and its connection with the lake by means of its feeder, extended to this little wooded bay when, by the second raising of the canal dam, the water was flooded to and among its trees.

But the defendant asserts that in this case the complainants' right is so doubtful that it ought not to be sustained on this motion, and the injunction should not be continued, either *pendente lite* or until final hearing, but the complainants should be put to their suit at law.

As to all this I have to remark, first, the original order was granted in September last with immediate restraint. The defendant came in with his defence and, as I understood at the hearing and as the history of the case indicates, set himself about obtaining *ex parte* affidavits, and the complainants did the same. There never was any default in the complainants bringing the order to show cause on for hearing. The delays in that respect were due to the conduct of the defendant, and when the hearing was brought on I understood that both parties were content to submit the matter on the affidavits as presented. There

appears to have been no effort on the part of the defendant to
bring the cause to hearing on a reference and an examination
of witnesses in open court.

In the second place, there are no serious contradictions in the
evidence.    The most important evidence consists in documents
and surveys and records.

But in the third place the defendant, in my judgment, mis-
conceives the true attitude of the parties.    The complainants'
right by the law of the land is perfectly clear *prima facie*.    The
defendant is seeking to justify himself by setting up a public
easement over the land of the complainants.    Here he assumes
the burden of proving that easement which he attempts to
exercise *manu forti*.    If the defendant had filed a bill to enjoin
the complainants from interfering with his navigation of the
canal in question and from landing at complainants' dock, then
the familiar rule of equity would have applied, and he would
not have been entitled to an injunction unless he had shown
that his right to the exercise of the easement was clear at law.
But that is not the present attitude of the parties.    And in at-
tempting to assert and maintain his right to the injury of the
complainants, the defendant is at the same disadvantage that
he would be if he were a complainant, and the complainants are
entitled to the same advantage of having a perfectly clear *prima
facie* right.

That this is a proper case in its circumstances for the interfer-
ence by this court in order to give the complainants adequate
relief and save a multiplicity of actions is too clear for argument.

I am clearly of the opinion that the complainants are entitled
to a continuance of the injunction, and will so advise.