Argued July 25, modified October 15, 1918.

# GUILLIAMS *v.* BEAVER LAKE CLUB.

### (175 Pac. 437.)

**Navigable Waters—"Navigable Stream"—Common Law.**

1. At common law all streams on which the tide ebbed and flowed were *prima facie* "navigable," and all other streams were held to be private or unnavigable.

**Navigable Waters—Navigability—Test.**

2. The test of navigability which is applied in most of the jurisdictions in the United States, including the Supreme Court of the United States, is navigability in fact.

**Navigable Waters—Classes.**

3. Streams and bodies of water as regards navigability are divided into several distinct classes: (1) Those in which the tide ebbs and flows; (2) those which are navigable in fact for boats, vessels, or lighters; (3) streams not navigable for any purpose; and (4) the larger rivers susceptible of a great volume of commerce.

**Navigable Waters—Capacity for Floatage.**

4. A stream capable in its natural state of floating sawlogs to market successfully is navigable for that purpose.

**Navigable Waters—Riparian Owners—Right to Water.**

5. Conceding that title to bed of stream which is navigable in fact is in riparian owners, they do not own the water itself, but only the use of it as it flows by their property.

> [As to riparian proprietor's right to use and detain water, and
> to the natural flow of the stream, see note in 79 Am. Dec. 638.]

**Navigable Waters—"Navigability"—Test.**

6. The test of navigability of a stream is its capacity to afford the length, width, and depth which enables boats and vessels to make successful progress through its waters, rather than circumstances involving the present right of approach to its banks.

**Navigable Waters—"Commerce"—Pleasure Boats.**

7. A vessel carrying a load of passengers to a picnic is in law as much engaged in "commerce" as one carrying grain or other merchandise.

**Navigable Waters—"Navigable Stream."**

8. A stream having well-defined banks, a well-defined channel, and a fairly constant depth of water sufficient to enable small boats and scows capable of conveying cattle, hay and other products to traverse its waters at all seasons, possesses a qualified navigability.

**Navigable Waters—Navigability—Evidence.**

9. In suit to enjoin defendant riparian owner from obstructing the outlet of a stream having a qualified navigability, up to his

property, but not beyond, by dam or otherwise, *held*, that plaintiffs have the right to navigate the stream down to and across lands of defendant under water, but that the dam is practically the limit of such navigation.

### Navigable Waters—Use of Shore.

10. Those using a stream having a qualified navigability have no right to land on the premises of a riparian owner without his permission.

### Navigable Waters—Right to Divert Channel.

11. Although it was necessary that defendant be permitted to build proposed dam to protect its land from erosion, it may be enjoined from placing any obstruction in non-navigable stream until it constructs a channel of sufficient capacity to carry off the water to the same extent as the natural channel.

From Lincoln: JAMES W. HAMILTON, Judge.

Department 2.

This is a suit to enjoin defendant from erecting or maintaining a dam near the mouth of Beaver Creek in Lincoln County, and to prevent the defendant from maintaining a wire fence across said creek. Beaver Creek is a small nontidal stream of insignificant size at a point 3½ miles above the ocean, but at its mouth, by reason of the sands thrown up by the sea, it becomes a lagoon or lake practically without current, of an average width from bank to bank of about 50 feet, and of a depth sufficient to float ordinary skiffs and small scows. It is shown that five persons living above the land of defendant have rowboats, and that there are two or three small scows being used to navigate such portions of the lagoon as occasion requires, and that there has been more or less navigation thereon for more than twenty years. Where the lagoon reaches within approximately 100 yards of the west line of defendant's land, it again exhibits a perceptible current, and from thence flows rapidly into the ocean over a practically unnavigable bed. This part of the stream changes its bed frequently by rea-

son of the winter storms, which deposit the sands at its mouth and up to and beyond defendant's west line. It is also shown that the waves of the ocean upon such occasions drive logs and driftwood even up into the still waters of the lagoon above. It further appears that on some occasions the sand is deposited in such quantities as to completely obstruct the flow of the creek into the ocean for several days at a time, but such occurrences are very infrequent. There is an interval between that portion of the lagoon capable of floating boats and the line of ordinary high tide, although it is shown that on at least one occasion two men, by wading the shallow portion of the stream in gum-boots, one man on each side of the skiff, managed to get it over the shallow water and into the breakers, but it may be reasonably said that navigation by small boats terminates on defendant's land, and in order to get to the line of ordinary high tide it is necessary for persons coming down the stream to go across defendant's premises, and that even such travel is confined to three or four individuals. It is shown that at some seasons of the year salmon ascend the stream into the lagoon, but it does not appear that it is fished at present for commercial purposes. It is shown that trout in considerable numbers abound in the lagoon and that there is more or less trout fishing engaged in during the summer months. It is also shown that by reason of the southerly winter storms, the sand from the sea has dammed up the mouth of Beaver Creek, and diverted its course further to the north, so that its course since 1915, instead of being generally in a northwesterly direction across the west side of defendant's land, has changed to a northerly direction and in some places east of north. This change has washed away a portion of defendant's land, and threat-

ens gradual destruction of a tract of from 40 to 60 acres, which the evidence tends to show contains the possibilities of a valuable cranberry tract, although only a small patch 60 or 70 feet square has been planted to cranberries. To protect this land from erosion the defendant attempted to construct a dam across the new channel of Beaver Creek running transversly across the creek in a general direction from west to east, and to make a new channel to the beach running in a general westerly direction, but failed to make the new channel deep enough to carry off the surplus water of the lake so that the dam backed up the water over the lands of plaintiffs, threatening some injury to their hay crops and to their pasturage on the low lands adjacent to the lake. A heavy storm caused the breakers to beat against the dam, and a part of the materials of which it was composed to be carried about a mile up the lagoon, thereby impeding to some extent the passage of small boats. This suit was brought to enjoin defendant from obstructing the outlet of Beaver Creek by dam or otherwise. The Circuit Court made the following findings of fact and decree:

"First: That Beaver Creek is a stream navigable by boats and that plaintiffs have lands situated on both sides of said stream; that the plaintiff Hester H. Coovert does not appear to have any interest in land situate along said stream.

"Second: That the defendant is the owner of real property on both sides of said stream below plaintiffs, being between plaintiffs' land and the confluence of said Beaver Creek with the Pacific Ocean.

"Third: That the defendant, for the purpose of protecting its lands from erosion caused by the changing conditions of the current of this stream, commenced to build and did complete a diversion dam in said stream.

"Fourth: That in constructing said dam defendant has to some extent caused the water to back and flow on to some of the lands of plaintiffs, doing some injury, but the extent of which does not appear in the evidence in this case.

"Fifth: That a short time after the completion of said dam it was swept out by the storms, and now remains an obstruction in said stream.

"Sixth: That the lands of defendant are so situate on said stream that the diversion of the waters thereof is highly necessary to preserve their said lands; that it appears from the evidence that another channel furnishing an outlet for the waters of said stream can be constructed, and the property of defendant protected, and at the same time plaintiff's land not injured.

"Seventh: That it appears from the evidence that defendant did not take the necessary precaution while building said dam to protect plaintiffs' property.

"Based upon the findings of fact and conclusions of law filed herewith in the above-entitled court and cause, it is hereby ordered, adjudged and decreed that defendant, its servants and agents, are hereby enjoined and restrained from materially backing the waters of Beaver Creek in Lincoln County, Oregon, over or upon the lands of any of plaintiffs; and that said defendants, its servants or agents, be and are hereby enjoined and restrained from turning the waters of said creek from its present channel until defendant has provided a new channel as suitable for navigation and affording an outlet for said waters as the present channel.

"Subject to these conditions and limitations defendant is permitted to divert the waters of said stream in protection of its said property.

"That plaintiffs recover from defendant their costs incurred herein."

From which decree defendant appeals.

MODIFIED.

For appellant there was a brief over the names of *Mr. Lawrence A. McNary* and *Mr. Edward J. Clark,* with an oral argument by *Mr. McNary.*

For respondents there was a brief submitted by *Mr. B. F. Jones.*

McBRIDE, C. J.—The case has two aspects, one being with reference to the navigability of the stream or lake in controversy, and the other as to the flowing back of its waters to the injury of other properties along its banks. We have been somewhat hampered in our investigations by the indefiniteness of the questions and answers in matters such as boundaries, etc., involved, where precise answers were required. To illustrate the difficulty as well as to point out a moral, we quote a few excerpts from the testimony:

"Q. In the summer-time, when you came down the creek, where did you land your boat?

A. We landed it all the way from where the Club House is here. (Indicating.)

Q. Here is the position of the Club House?

A. We land from that all the way down in here."

There are pages of this sort of questions and answers, all of which may have been plain to the trial judge, who had the witness and the map before him, but the location of "here" and "there" is somewhat misty to one, who does not have that advantage. We call attention to this not because the attorneys in this case are negligent in this respect beyond hundreds of others, but to suggest that if "here" and "there" and "yonder" were always tied to some letter of the alphabet or designated by numerals, of which our system of notation furnishes unfailing and adequate combinations, the appellate court would be better able to properly understand and appraise the testimony.

1–3. We address ourselves to the first question. Is Beaver Creek, or lake, navigable within the meaning of the law? At common law, all streams on which the

tide ebbed and flowed were *prima facie* navigable, and all other streams were held to be private or unnavigable, but this rule arose from the fact that in England the rivers generally were of insignificant size and length, furnishing no facilities for commerce or general public use. On the continent of Europe, where the rivers were in fact navigable, that fact furnished the test, which is the test applied in most of the jurisdictions of this country, including the Supreme Court of the United States: *Shaw* v. *Oswego Iron Co.,* 10 Or. 371 (45 Am. Rep. 146), and cases there cited. As shown in that opinion, streams and bodies of water are divided into several distinct classes. (1) Those in which the tide ebbs and flows, which are technically denominated navigable, in which class the sovereign is the owner of the soil constituting the bed of the stream, and all right to it belongs exclusively to the public. (2) Those which are navigable in fact for boats, vessels, or lighters. In these the public has an easement for the purposes of navigation and commerce, they being deemed public highways for such purposes, although the title to the soil constituting their bed remains in the adjacent owner, subject to the superior right of the public to use the water for the purposes of transportation and trade. (3) The streams which are so small and shallow that they are not navigable for any purpose, the public has no right to whatever. (4) To this list may be added our larger rivers susceptible of a great volume of commerce where the title to the bed of the stream remains in the state for the benefit of the public.

It is obvious that the body of water here in litigation does not belong to the first class, as it is nontidal and has never been meandered but has been sectionized and disposed of as so much land. In some respects

the conditions are similar to the case made by the plaintiff in *Shaw* v. *Oswego Iron Co.,* 10 Or. 371 (45 Am. Rep. 146), the distinction between the cases being pointed out later. The real crux of this case lies in properly defining the rule as to what constitutes navigation. It is also clear from the testimony that Beaver Lake cannot be included in the fourth class of waters, as it is not contended that it is susceptible of being an artery of any very extended commerce.

The term "navigable waters," as applied to non-tidal streams, has been often defined by the courts of this country, and while some of the definitions are apparently somewhat conflicting, yet when read with reference to the particular circumstances of each case they substantially agree. We select the following instances from the many collated in 2 Words and Phrases (2 ed.), 526. In Illinois the term has been defined as follows:

"A stream, in order to be 'navigable,' must be of common or public use for the carriage of boats and lighters, and of bearing up and floating vessels for the transportation of property conducted by the agency .of man. It is navigable in fact only when it affords a channel for useful commerce, and is a practical utility to the public as such, and in its ordinary natural condition furnishes a highway over which commerce is or may be carried in the customary modes of conducting commerce by water. It is not sufficient that it is available in places for rowboats or small launches, or that hunters and fishermen pass over the water in boats used for that purpose: *People* v. *Economy Light & Power Co.,* 241 Ill. 290 (89 N. E. 760, 771); *Schulte* v. *Warren,* 218 Ill. 108, 119 (75 N. E. 783, 785, 13 L. R. A. (N. S.) 745).

From Wisconsin we have the following definition:

"The term 'navigable stream' is not limited to a tide-water stream, but the question in each case is

whether it is in fact navigable; that is, used or susceptible of being used, in its ordinary condition, as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. Willow River, an indirect tributary of the Mississippi, capable of floating logs at certain seasons of the year and carrying rowboats, although not meandered, and so shallow that in places the boats have to be pushed, is a public 'navigable stream': *Willow River Club* v. *Wade,* 100 Wis. 86 (76 N. W. 273, 276, 42 L. R. A. 305).''

From North Carolina we have the following:

''If a stream is 'navigable in fact, it is navigable in law': Gould, Waters (3 ed.), 67. The capability of being used for purposes of trade and travel in the usual and ordinary mode is the test, and not the extent and manner of such use. * * Navigability cannot be affected by the conditions on the adjacent land, such as there being a large town on the shore, with numerous streets and wharves, or whether * * one riparian owner has a monopoly of the land, with no public road to the water, thus cutting off access to the land. It is the navigability of the water that is the test'': *State* v. *Twiford,* 136 N. C. 603 (48 S. E. 586, 587).

From Kansas, we have the following:

''Any water, to be 'navigable,' must be susceptible of use for purposes of commerce, or possess the capacity for valuable floatage in transportation to market of the products of the country through which it runs, and must be of practical usefulness to the public as a public highway in its own state and without the aid of artificial means; a theoretical or potential navigation or one that is temporary, precarious, and unprofitable not being sufficient: *Dana* v. *Hurst* (*Hurst* v. *Dana*), 86 Kan. 947 (122 Pac. 1041, 1042).''

4. The cases in this court have arisen mainly with respect to the floatability of streams for the purpose of conveying sawlogs to market, in which it is held in

effect that a stream capable in its natural state of float-
ing sawlogs to market successfully, is navigable for
that purpose: *Weise* v. *Smith,* 3 Or. 445 (8 Am. Rep.
621); *Shaw* v. *Oswego Iron Co.,* 10 Or. 371 (45 Am.
Rep. 146); *Haines* v. *Welch,* 14 Or. 319 (12 Pac. 502);
*Nutter* v. *Gallagher,* 19 Or. 375 (24 Pac. 250); *Micelli*
v. *Andrus,* 61 Or. 78 (120 Pac. 737); *Kamm* v. *Nor-
mand,* 50 Or. 9 (91 Pac. 448, 126 Am. St. Rep. 698, 11
L. R. A. (N. S.) 290).

Some of the federal authorities introduce another
element into the definition of "navigable waters,"
namely: that of public ingress and egress to the
stream.    Thus, in *Harrison* v. *Fite,* 148 Fed. 781 (78
C. C. A. 447), it is said:

"To meet the test of navigability as understood in
the American law, a watercourse should be susceptible
of use for purposes of commerce or possess a capacity
for valuable floatage in the transportation to market
of the products of the country through which it runs.
It should be of practical usefulness to the public as a
public highway in its natural state and without the
aid of artificial means.    A theoretical or potential
navigability, or one that is temporary, precarious, and
unprofitable, is not sufficient.    While the navigable
quality of a watercourse need not be continuous,
yet it should continue long enough to be useful and
valuable in transportation; and the fluctuations
should come regularly with the seasons, so that the
period of navigability may be depended upon.    Mere
depth of water, without profitable utility, will not
render a watercourse navigable in the legal sense, so
as to subject it to public servitude, nor will the fact
that it is sufficient for pleasure boating or to enable
hunters or fishermen to float their skiffs or canoes.
To be navigable a watercourse must have a useful
capacity as a public highway of transportation: *Toledo
Liberal Shooting Co.* v. *Erie Shooting Club,* 90 Fed.
680 (33 C. C. A. 233); *Moore* v. *Sanborne,* 2 Mich. 520,
524 (59 Am. Dec. 209); *Morgan* v. *King,* 35 N. Y. 454,

458 (91 Am. Dec. 58); *Brown* v. *Chadbourne,* 31 Me. 9
(50 Am. Dec. 641); *Griffith* v. *Holman,* 23 Wash. 347
(63 Pac. 239, 83 Am. St. Rep. 821, 54 L. R. A. 178);
*Wethersfield* v. *Humphrey,* 20 Conn. 218; *Rowe* v.
*Granite Bridge,* 38 Mass. 344; *Gaston* v. *Mace,* 33
W. Va. 14 (10 S. E. 60, 25 Am. St. Rep. 848, 5 L. R. A.
392); *Neaderhouser* v. *State,* 28 Ind. 257; *Rhodes* v.
*Otis,* 33 Ala. 578 (73 Am. Dec. 439); *Railroad* v. *Brooks,*
39 Ark. 403 (43 Am. Rep. 277).''

This view of the law seems to have the approval of
the Court of Errors and Appeals of the State of New
Jersey in *King* v. *Muller,* 73 N. J. Eq. 32 (67 Atl. 380),
wherein the court quoted with approval from 1 Farnham on Waters, page 100, the following excerpt:

''A navigable body of water is one which the public
has a right to use for the purposes of navigation. The
term includes all waters which for a period long enough
to be of commercial value are of sufficient capacity
to float water craft for the purposes of commerce, or
to float to market the products of the country through
which the water extends, so as to be useful to the population along its banks. * * The stream must be of
some value to trade, commerce or agriculture. And
this excludes waters which are merely capable of floating a skiff for pleasure. And to be useful for these
purposes the water must connect with other waters or
lead from one public place to another, so as to be in the
path of commerce. So, a stream is not navigable so
as to be a public highway which leads from a public
river to a private house, or to which the public have
no access except at one point, where a highway approaches it. In order to be public it must have a terminus by which the public can enter it, and another
from which it can leave it. But a stream to be public
need not lead from one county to another. The rights
of the public are entirely dependent on the capacity of
the stream for navigation.''

The authorities above cited seem in substantial accord as to the proposition that for a stream to be con-

sidered navigable in fact, must be of such depth as to
be in its natural state capable of being a useful means
of trade and travel and of contributing in some degree
to commerce; but there is an apparent divergence as
to whether the test is by the actual commerce being
carried on, or the potentialities of commerce in the
future. As will be seen by the case last quoted, some
courts seem to make the present conditions on the
banks of the stream, or lake, the test of its navigability,
rather than the condition of the body of water itself.
The test applied in *King* v. *Muller,* 73 N. J. Eq. 32
(67 Atl. 380), carried to its logical conclusion, might
entirely exclude from the right of navigation over a
body of water deep enough and broad enough to float
the largest vessel and miles in length. A single ripa-
rian owner, if perchance there were no public egress
from the stream, would be debarred from the privilege
of navigating his boat over its waters beyond the con-
fines of his own land, and the stream itself be fenced
by each riparian owner so as to make each portion
of it adjoining such riparian property a private re-
serve. It is needless to say that the very eminent
jurist who applied the language used by Mr. Farnham
as a test of navigability of a body of water, did not
intend that such test should be the sole criterion, but
was applying it to the concrete case then under con-
sideration, which was where a canal leading to a lake
originally unnavigable but made susceptible to some
sort of navigation by a dam erected at its outlet, had
been constructed by private owners from their own
premises to the lake in question, in which case it was
held in substance that the construction of the artificial
channel for the constructor's own use and upon his
own property, did not operate as a dedication of it to

the public, and that it was not a public navigable stream.

The case of *Harrison* v. *Fite,* 148 Fed. 781 (78 C. C. A. 447), the language of which we have quoted, would seem to support defendant's contention, but when considered with reference to the facts it does not go to the extent claimed by the defendant here, as the court found that the alleged lake, the navigability of which was one branch of the controversy, was in fact an unnavigable swamp, and that Little River, whose navigability was the remaining subject of contention, was not navigable for the reasons which we quote:

"Witnesses testified that in times of high water there has been no successful navigation of it in recent years, except with gasoline launch drawing but a few inches of water, and with canoes, skiffs, and dugouts of the hunters and fishermen; that it is not being used to float the products of the fields and forests to market, and cannot be profitably and successfully used for that purpose. And, if practical adaptability and usefulness are the tests, the finding of the court under the evidence was right."

5. While there are many authorities which seem to lean to the doctrine that the present use of a stream for the purposes of trade or commerce is the test of its navigability, we are not prepared to say that such is the only test, or to go so far even as to say that its only test is its capacity to carry goods or articles of trade to and from the place where they are marketed. This is comparatively a new country and there are many streams and lakes whose shores are sparsely if at all settled and which in their natural state may, as settlements along their borders continue, become valuable highways for the carriage of the produce of those who may reside along their banks. Public highways

may be constructed and towns built where people may reside for the purposes of health, pleasure, or profit, and where actual navigability of the water exists, courts should not lightly consign them to unrestricted private ownership. Whatever may be the title to the bed of such streams or bodies of water (and it may be conceded in this case that such title is in the riparian proprietors) they do not own the water itself but only the use of it as it flows past their property. Under the conditions prevailing in this comparatively new country we are not prepared to say that bank conditions upon a stream actually navigable so far as water conditions are concerned, should always be controlling. As remarked in *Hickok* v. *Hine,* 23 Ohio St. 523 (13 Am. Rep. 255):

"The character of a river, as such highway, is not so much determined by the frequency of its use for that purpose as it is by its capacity of being used by the public for purposes of transportation and commerce."

To the same effect is *Sullivan* v. *Spotswood,* 82 Ala. 163 (2 South. 716).

6-8. Nor are we prepared to say that the facility for transportation of goods and commodities to and from market is an infallible test of the navigability of a body of water. The Columbia River, in a legal sense, was just as navigable a century ago when it "heard no sound save its own dashing" as it is with the commerce of three states being borne upon its waters. The test of navigability of a stream in the summing up, is the capacity to afford the length, width and depth to enable boats and vessels to make successful progress through its waters, rather than circumstances involving the present right of approach to its banks. The latter are changeable and subject

to the will of man, the former is a physical condition dependent upon nature.  Even confining the definition of navigability, as many courts do, to suitability for the purposes of trade and commerce, we fail to see why commerce should not be construed to include the use of boats and vessels for the purposes of pleasure. The vessel carrying a load of passengers to a picnic is in law just as much engaged in commerce as the one carrying grain or other merchandise.  We think it only fair to assume that a train carrying passengers only between Portland and San Francisco is as much engaged in interstate commerce as any other train on the road.  One has only to glance at the multitude of definitions of "commerce" collected in "Words and Phrases" under that title to see what an extended meaning the courts have given it.  Take the case at bar as an example.  Here is a body of water 3½ miles long with an average width of at least 50 feet, and a depth capable of floating successfully skiffs and small boats of average size, and scows capable of conveying cattle, hay and other products, and affording a surface over which people may travel for pleasure, or for the purpose of fishing and of which the defendant is one of several riparian proprietors.  Is it in accord with sound public policy that each riparian owner shall have the right to fence his portion of the stream and say to those above and below him, "This body of water is mine; 'Thus far shalt thou go and no farther' "? We think not.  While perhaps a majority of the decisions would, upon a cursory reading, appear to sanction such obstruction, and while some actually seem to apply the common-law rule in regard to navigable waters to our smaller fresh-water streams, a careful examination of these decisions will show that such streams were not in fact navigable, but, on the con-

trary, boats were merely pushed and hauled over the shallow beds, and that this so-called "navigation" was used as a pretext to enable the "navigators" to trespass on lands not their own for the purpose of fishing and hunting. In the case at bar the stream has well-defined banks, a well-defined channel, and a fairly constant depth of water to enable boats of the description above set forth to traverse its waters at all seasons, and to that extent we hold that it possesses a qualified navigability.

The whole question here considered came before the Supreme Court of Minnesota in *Lamprey* v. *State,* 52 Minn. 181 (53 N. W. 1139, 38 Am. St. Rep. 541, 18 L. R. A. 670). That case seems so exactly to coincide with the case at bar and the general conditions are so similar to those existing in this state, that we quote from it the following:

"In this country, while still retaining the common-law classification of navigable and non-navigable, we have, in view of our changed conditions, rejected its test of navigability, and adopted in its place that of navigability in fact; and, while still adhering to navigability as the criterion whether waters are public or private, yet we have extended the meaning of that term so as to declare all waters public highways which afford a channel for any useful commerce, including small streams, merely floatable for logs at certain seasons of the year. Most of the definitions of 'navigability' in the decided cases, while perhaps conceding that the size of the boats or vessels is not important, and, indeed, that it is not necessary that navigation should be by boats at all, yet seem to convey the idea that the water must be capable of some commerce of pecuniary value, as distinguished from boating for mere pleasure. But if, under present conditions of society, bodies of water are used for public uses other than mere commercial navigation, in its ordinary sense, we fail to see why they ought not to be held

to be public waters, or navigable waters, if the old nomenclature is preferred.  Certainly, we do not see why boating or sailing for pleasure should not be considered navigation, as well as boating for mere pecuniary profit.  Many, if not the most, of the meandered lakes of this state, are not adapted to, and probably will never be used to any great extent for commercial navigation; but they are used—and as population increases, and towns and cities are built up in their vicinity, will be still more used—by the people for sailing, rowing, fishing, fowling, bathing, skating, taking water for domestic, agricultural, and even city purposes, cutting ice, and other public purposes which cannot now be enumerated or even anticipated.  To hand over all these lakes to private ownership, under any old or narrow test of navigability, would be a great wrong upon the public for all time, the extent of which cannot, perhaps, be now even anticipated.  When the colony of Massachusetts 250 years ago, reserved to public use her 'great ponds,' probably only fishing and fowling were in mind, but, as is said in one case, 'with the growth of the community, and its progress in the arts, these public reservations, at first set apart with reference to certain special uses only, became capable of many others, which are within the design and intent of the original appropriation.  The devotion to public use is sufficiently broad to include them all, as they arise'; *West Roxbury* v. *Stoddard,* 7 Allen, 158.  If the term 'navigable' is not capable of a sufficiently extended meaning to preserve and protect the rights of the people to all beneficial public uses of these inland lakes, to which they are capable of being put, we are not prepared to say that it would not be justifiable, within the principles of the common law, to discard the old nomenclature, and adopt the classification of public waters and private waters.  But, however that may be, we are satisfied that, so long as these lakes are capable of use for boating, even for pleasure, they are navigable, within the reason and spirit of the common-law rule.''

9, 10. We conclude that plaintiffs have a right to navigate the stream down to and across the lands of defendant, and that defendant's dam is practically the limit of such navigation; that the stream below this is incapable of navigation and that plaintiffs cannot go beyond this without trespassing on defendant's premises, the westerly line of which we find to be the meander line shown on the map submitted in evidence. Neither have the plaintiffs any right to land at any point on defendant's land without permission. This disposes of one branch of the case.

11. The remaining matter in controversy relates to the flowing back of the water by reason of the erection of the dam. It is evidently necessary that the defendant should be permitted to build the dam proposed in order to protect valuable land from erosion. It also appears that in building such dam they have not used sufficient care to protect the lands of other riparian owners from overflow, and although the present damage has been slight yet its recurrence—and it seems likely to recur if the method heretofore pursued is continued—will be a continuing injury to plaintiff's lands, and defendant should be enjoined from placing any dam or other obstruction in the stream until it has constructed a channel to the beach of sufficient capacity to carry off the water of the creek to the same extent as the natural channel.

The whole case is before us upon the pleadings and testimony, and in the interest of all parties it should be fully settled here. Each party is claiming more than it is entitled to, therefore, the decree below will be modified by enjoining defendant from obstructing the stream by dam, or otherwise, at any point at or above the dam shown in the testimony, and from rebuilding the same at any place in the stream, until it

has provided a channel of sufficient capacity to prevent such dam from overflowing the land of plaintiffs; and plaintiffs, and each of them, shall be enjoined from landing or going upon the lands of defendant between the westerly meander lines above described and its easterly boundary, without defendant's permission, and that neither party recover costs in this court. In all other respects the decree is affirmed.     MODIFIED.

JOHNS, BEAN and BENSON, JJ., concur.